OPINION
{¶ 1} Appellant, Eugene Whelan, Executor of the Estate of Edward Whelan, deceased ("Whelan"), appeals the judgment entered by the Geauga County Court of Common Pleas. The trial court entered summary judgment in favor of appellee, Vanderwist of Cincinnati, Inc. ("Vanderwist"). *Page 2 
 {¶ 2} In April 2004, Todd Kinsey began working at Vanderwist as a service technician. Kinsey lived in Ravenna, Ohio and would commute to the Vanderwist garage in Chagrin Falls, Ohio every morning. Once at the garage, Kinsey would clock in, obtain his work assignments for the day, and then leave with other Vanderwist employees in a company vehicle. Kinsey's primary duties included the installation and maintenance of sprinkler systems and landscape lighting. Mike Heis hired Kinsey and was his direct supervisor at Vanderwist.
 {¶ 3} In December 2004, due to the change in weather, the job duties of the Vanderwist employees changed. Some of the employees were laid off. Other employees plowed snow. Finally, other employees, including Kinsey, performed tasks at the office such as year-end inventory and assisting with accounts receivable. Also, Heis had previously shown Kinsey the snow removal routes, in case Kinsey was ever needed to assist with snow removal.
 {¶ 4} On December 22, 2004, Vanderwist had a company Christmas party. That day, Kinsey left his residence in Ravenna in the morning. Kinsey picked up Joe Kelly, another Vanderwist employee, at his residence in Mantua, Ohio. Kinsey and Kelly arrived at the Vanderwist garage about 8:00 a.m. Upon arriving at the garage, Kinsey clocked in. About 9:30 a.m., all the employees left the Vanderwist garage and carpooled to a bowling alley in Solon, Ohio. At the bowling alley, the group bowled two games. During that time, the group ate nachos and consumed beer. Heis bought at least two pitchers of beer, and someone else also purchased a pitcher of beer. Kinsey consumed two or three beers at the bowling alley. *Page 3 
 {¶ 5} At about 11:30 a.m., the group went back to the Vanderwist garage. On the way, the group stopped and, according to Kinsey, Heis purchased two 12-packs of beer. At the Vanderwist garage, the group played Texas Hold'em, a version of poker. While playing cards, the group ate chicken wings and pizza, and consumed more beer. Kinsey had two or three more beers at the Vanderwist garage.
 {¶ 6} On December 22, 2004, a significant snowstorm hit the area. Shortly before 1:00 p.m., Heis received a call that snow removal was needed. At that time, the poker game ended, and various employees left to assist with snow removal. Kinsey, Kelly, and Edward Whelan ("Edward Whelan") left together in Kinsey's personal car. Edward Whelan was a former employee of Vanderwist. By December 22, 2004, Edward Whelan had been laid off by Vanderwist. The group informed Heis that they were going to go home and change clothes and then return to the Vanderwist garage to assist with snow removal. Shortly after leaving the Vanderwist garage, Kinsey's vehicle hit a patch of ice, went left-of-center, and was struck by an on-coming vehicle. Edward Whelan died as a result of the accident. Kinsey informed the investigating officer that he and the others were on their way home to change clothes and, then, return to the Vanderwist garage to assist with snow removal.
 {¶ 7} Kinsey was laid off by Vanderwist shortly after the accident. He began collecting unemployment benefits at that time. On January 21, 2005, Kinsey was reprimanded for violating Vanderwist's drug and alcohol policy. While the form does not indicate why Kinsey was reprimanded, Diane Baumgartner, a co-owner and the Vice President of Vanderwist, stated that the reprimand was due to an incident on January *Page 4 
20, 2005, when Kinsey and two other Vanderwist employees used a company vehicle to travel to a store, where they purchased alcohol.
 {¶ 8} Whelan filed a complaint for wrongful death against Kinsey, Vanderwist, and various unknown defendants. The case was filed in the Cuyahoga County Court of Common Pleas. After filing its answer, Vanderwist filed a motion for summary judgment. Vanderwist attached an affidavit from Heis to its motion for summary judgment. Prior to ruling on Vanderwist's motion for summary judgment and upon Vanderwist's motion, the Cuyahoga County Court of Common Pleas transferred the case to the Geauga County Court of Common Pleas.
 {¶ 9} After the case was transferred to Geauga County, Whelan filed an amended complaint. Whelan's amended complaint raised three causes of action against Vanderwist: (1) negligence pursuant to the doctrine of respondeat superior; (2) negligence under a "business host" theory; and (3) a claim for negligent hiring, supervision, and retention. In response, Vanderwist filed an amended answer and an amended motion for summary judgment. Whelan filed a brief in opposition to Vanderwist's motion for summary judgment. Whelan attached several documents to its brief in opposition, including: (1) copies of Kinsey's employment records at Vanderwist showing his hours worked during 2004; (2) a copy of a reprimand issued by Vanderwist to Kinsey for violating the company's drug and alcohol policy; and (3) a copy of Kinsey's application for unemployment benefits. Thereafter, Vanderwist filed a reply brief to Whelan's brief in opposition to Vanderwist's motion for summary judgment. Vanderwist attached several documents to this pleading, including: (1) Heis' affidavit; (2) an affidavit from Diane Baumgartner; (3) Kinsey's weekly time record for the week of December 20, *Page 5 
2004; and (4) a copy of the reprimand issued to Kinsey for violating Vanderwist's drug and alcohol policy. In addition to the documents attached to the parties' pleadings, a copy of Kinsey's deposition was filed in the record.
 {¶ 10} The matter was referred to a magistrate. The magistrate issued her decision in July 2006. She recommended that Vanderwist's motion for summary judgment be granted. Whelan filed objections to the magistrate's decision pursuant to Civ. R. 53. On August 28, 2006, the trial court overruled Whelan's objections and granted Vanderwist's motion for summary judgment.
 {¶ 11} In September 2006, Whelan filed a notice of appeal of the trial court's August 28, 2006 judgment entry to this court. This matter was assigned case No. 2006-G-2732. Vanderwist filed a motion to dismiss this prior appeal for lack of a final, appealable order. In granting Vanderwist's motion to dismiss, this court held that the trial court's judgment entry was not a final, appealable order, because the judgment entry failed to dispose of the claims pending against Kinsey nor did the entry contain language pursuant to Civ. R. 54(B). Whelan v. Vanderwist ofCincinnati, 11th Dist. No. 2006-G-2732, 2006-Ohio-6690, at ¶ 16. Accordingly, this court dismissed the prior appeal. Id. at ¶ 20.
 {¶ 12} On March 1, 2007, the trial court issued a judgment entry indicating that, "pursuant to Civ. R. 54(B) there is no just reason for delay in granting Vanderwist's Motion for Summary Judgment." Whelan has timely filed an appeal from the trial court's March 1, 2007 judgment entry.
 {¶ 13} Whelan raises the following assignment of error: *Page 6 
 {¶ 14} "The Trial Court erred in granting the Motion for Summary Judgment of Defendant/Appellee Vanderwist of Cincinnati, Inc."
 {¶ 15} Pursuant to Civ. R. 56(C), summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Dresher v. Burt (1996),75 Ohio St.3d 280, 293. In addition, it must appear from the evidence and stipulations that reasonable minds can come to only one conclusion, which is adverse to the nonmoving party. Civ. R. 56(C). The standard of review for the granting of a motion for summary judgment is de novo.Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105.
 {¶ 16} "Since summary judgment denies the party his or her `day in court' it is not to be viewed lightly as docket control or as a `little trial.' The jurisprudence of summary judgment standards has placed burdens on both the moving and the nonmoving party. In Dresher v.Burt, the Supreme Court of Ohio held that the moving party seeking summary judgment bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record before the trial court that demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim. The evidence must be in the record or the motion cannot succeed. The moving party cannot discharge its initial burden under Civ. R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case but must be able to specifically point to some evidence of the type listed in Civ. R. 56(C) that affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. If the moving party has *Page 7 
satisfied its initial burden, the nonmoving party has a reciprocal burden outlined in the last sentence of Civ. R. 56(E) to set forth specific facts showing there is a genuine issue for trial. If the nonmoving party fails to do so, summary judgment, if appropriate shall be entered against the nonmoving party based on the principles that have been firmly established in Ohio for quite some time in Misteff v.Wheeler (1988), 38 Ohio St.3d 112.
 {¶ 17} "* * *
 {¶ 18} "The Supreme Court in Dresher went on to hold that whenneither the moving nor nonmoving party provides evidentiary materials demonstrating that there are no material facts in dispute, the moving party is not entitled to a judgment as a matter of law as the moving party bears the initial responsibility of informing the trial court of the basis for the motion, `and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim.' [Dresher v. Burt,75 Ohio St.3d at 276.]" Welch v. Ziccarelli, 11th Dist. No. 2006-L-229,2007-Ohio-4374, at ¶ 40-42. (Emphasis in original.)
 {¶ 19} Whelan argues that Vanderwist may be liable under a "business host" theory. Vanderwist argues that Whelan has abandoned this argument by failing to raise it on appeal. We note that Whelan contests the magistrate's finding that no business was conducted at the Christmas party by arguing that a woman from Yardmaster, a client of Vanderwist's, was at the party. However, Whelan provides no case law or legal argument in support of the "business host" theory of liability. Thus, Whelan has waived this argument. See, e.g., App. R. 12(A)(2). Therefore, we will only briefly address this argument. *Page 8 
 {¶ 20} Whelan contends that Vanderwist was a "business host" due to the fact that business was arguably conducted during the party. However, we are not aware of a separate class of providers known as a "business host," and Whelan does not cite any legal authority in support of this claim. Rather, providers of alcohol fall into two general categories, "social hosts" and liquor permit providers. In Ohio, "a social provider of alcohol to an intoxicated person, unlike a permit holder, is not liable to third persons subsequently injured by the intoxicated person."State Farm Mut. Auto. Ins. Co. v. King, 12th Dist. Nos. CA2005-04-045 CA2005-04-049, 2006-Ohio-336, at ¶ 31, citing Settlemyer v. WilmingtonVeterans Post No. 49 (1984), 11 Ohio St.3d 123, 127. There is no evidence in the record to suggest that Vanderwist was anything other than a social host. Vanderwist did not sell beer or engage in other behavior consistent with that of a liquor permit holder. See R.C. 4301.22 and 4303.01, et seq. At the bowling alley, the beer was purchased from the bowling alley for consumption by the Vanderwist employees. Therefore, Vanderwist was not responsible for the actions of those drinking the beer on a theory of direct negligence. Great CentralIns. Co. v. Tobias (1988), 37 Ohio St.3d 127, syllabus. Thereafter, beer was purchased from a store and given to the Vanderwist employees. Likewise, on a theory of direct negligence, Vanderwist is not responsible for individuals' actions resulting from the consumption of this beer. See, e.g., State Farm Mut. Auto. Ins. Co. v. King,2006-Ohio-336, at ¶ 31-32. The trial court did not err by entering summary judgment in favor of Vanderwist on this claim.
 {¶ 21} Whelan claims Vanderwist was liable under the doctrine of respondeat superior. "`It is well-established that in order for an employer to be liable under the doctrine of respondeat superior, the tort of the employee must be committed within the *Page 9 
scope of employment.'" Groob v. KeyBank, 108 Ohio St.3d 348,2006-Ohio-1189, at ¶ 42. (Citations omitted.) The conduct of an employee falls within the scope of his employment when (1) it is the kind of work he is employed to perform, (2) it does not occur outside permitted time and space limitations, and (3) it is performed to benefit the master.Akron v. Holland Oil Co., 102 Ohio St.3d 1228, 2004-Ohio-2834, at ¶ 12-15 (Pfiefer, J., dissenting) quoting The Restatement of the Law 2d, Agency (1957), Section 228. Whether an employee is acting within the scope of his employment is a question of fact. Martin v. Central OhioTransit Auth. (1990), 70 Ohio App.3d 83, 92, quoting Posin v. A.B.C.Motor Court Hotel (1976), 45 Ohio St.2d 271, 278-279.
 {¶ 22} Whelan contends there is a genuine issue of material fact as to whether Kinsey was acting in the course and scope of his employment by traveling to his home to change clothes to assist in snow removal. The following colloquy occurred during Kinsey's deposition:
 {¶ 23} "Q. There's an indication in the police report that you told the deputy that investigated the accident that you were going home to change clothes to go plow?
 {¶ 24} "A. Yes, that's what we told Mike, but we weren't coming back.
 {¶ 25} "Q. Did Mike ask you to plow?
 {¶ 26} "A. He did. I mean, I wasn't planning on driving back out there. Ted was laid off so he didn't want to do it.
 {¶ 27} "Q. Let me ask you this, how was it left with Mike when you guys left the office? Did Mike say I'd like you guys to plow?
 {¶ 28} "A. Yeah, I'm sure he wanted help, yes.
 {¶ 29} "Q. But, I mean, did he specifically ask you? *Page 10 
 {¶ 30} "A. I don't remember. I might have volunteered or I said, yeah, I might come back.
 {¶ 31} "* * *
 {¶ 32} "Q. And you weren't intending to come back from your home to do any work for Vanderwist that day?
 {¶ 33} "A. They thought I was, but I was misleading them. Me and Ted both knew we weren't coming back, as well as Joe Kelly."
 {¶ 34} On the day in question, Heis received a call that snow removal was needed. Several employees, including Heis, actually removed snow on that day. Further, Kinsey's statements in his deposition suggest that Heis asked for his assistance in snow removal on December 22, 2004. Also, Kinsey stated he told Heis that he was going home to change his clothes and return to the Vanderwist garage to assist with snow removal.
 {¶ 35} Vanderwist places significant weight on Kinsey's statement that he was heading home and did not intend to return to assist with snow removal. However, this statement is in direct conflict to what he told Heis he intended to do on December 22, 2004. Also, it is in conflict with the information he provided to the investigating officer at the scene of the accident. Accordingly, there is a genuine issue of material fact as to whether Kinsey was working at the time of the accident or if he was merely heading home for the day.
 {¶ 36} Vanderwist argues that Kinsey did not regularly assist with snow removal but worked in the office on accounts receivable. However, it is important to note that Kinsey only worked at Vanderwist from April 2004 through December 2004. Therefore, *Page 11 
during the majority of Kinsey's employment, no employees of Vanderwist were engaged in snow removal. Kinsey stated that Heis had previously shown him the snow removal routes, in case Kinsey's assistance was needed in that regard. One reason Kinsey was showed the snow removal routes was that "he was close to some of the jobs." In light of the fact that snow removal was in the scope of employment for many Vanderwist employees and there was evidence that Kinsey was asked to and/or volunteered to assist in snow removal on December 22, 2004, the fact that Kinsey had not previously assisted in snow removal is not determinative. Accordingly, there is a genuine issue of material fact as to whether snow removal was the kind of work Kinsey was employed to perform.
 {¶ 37} The next question is whether the conduct occurred outside of the permitted space and time restrictions. The accident occurred shortly after 1:00 p.m., which was during a business day. Thus, there was evidence that Kinsey's conduct occurred in the requisite time period. Vanderwist argues that Kinsey was a fixed site employee. However, there is evidence that Kinsey routinely left the Vanderwist garage to perform landscaping work at various locations. In addition, the snow plow routes were spread out, including some near Kinsey's home. Kinsey's actions were going home to change clothes to assist with snow removal. It is also important to note that Vanderwist provided Kinsey with a cell phone, and employees were called by Vanderwist to inform them of changes in their planned destinations. As such, there is a genuine issue of material fact as to whether the accident occurred within the geographical limits of Kinsey's employment. *Page 12 
 {¶ 38} Finally, there is a genuine issue of material fact as to whether Kinsey's actions benefited Vanderwist. If it is believed that Kinsey was going home to change clothes to assist with snow removal, his actions certainly benefited Vanderwist, as Vanderwist's clients would have their snow removed and Vanderwist would be paid for the service.
 {¶ 39} On the day in question, Kinsey clocked in upon arriving at the Vanderwist garage. Kinsey stated that it was his common practice to clock in upon arriving at the Vanderwist facility because "that's how [he] got paid. If [he] didn't punch in or out [he] didn't get paid." The magistrate gave significant weight to Kinsey's statement that he clocked in on December 22, 2004 to be a "smart guy" and to see if he could "sneak a paid day off." Kinsey's statement about being a smart guy was made during his deposition over one year after the incident. Kinsey's actions of clocking in on the day in question suggest that he was "on the clock" on December 22, 2004, as this was his standard routine. Thus, his statement about being a smart guy created a factual question as to what Kinsey's intentions were on December 22, 2004.
 {¶ 40} Moreover, even if a finder of fact were to conclude that Kinsey was not on the clock for the purposes of the activities associated with the Christmas party during the morning hours of December 22, 2004, this would not preclude a finding that Kinsey was on the clock at the time of the accident. There was a distinct time shortly before 1:00 p.m. on December 22, 2004, when the activities of the Vanderwist employees significantly changed. At that time, the group stopped drinking beer and playing cards, and took action to assist with snow removal. Thus, at a minimum, there is a genuine issue of material fact as to whether Kinsey was on the clock after he was asked by his *Page 13 
direct supervisor to assist with snow removal, agreed to help with the snow removal, and, then, took action to facilitate the snow removal.
 {¶ 41} The magistrate concluded in her findings of fact that Kinsey was not paid for any work on December 22, 2004. The magistrate erred in making this conclusion as a matter of law, as the evidence presented created a factual question on this issue. When Kinsey was asked if he was paid for that day, he responded, "I don't know. Could have been." Diane Baumgartner stated in her affidavit that Vanderwist paid Kinsey for two hours of work on December 22, 2004. She stated that the payment was "erroneously" made, but that Vanderwist did not attempt to recover the funds from Kinsey. There is evidence in the record showing that Kinsey was paid for some work on December 22, 2004. Presumptively, employees are only paid if they are working. As such, Baumgartner's statement that the payment was erroneous created a factual question for the jury.
 {¶ 42} Whelan argues that the fact that Kinsey received a reprimand is indicative that he was working on December 22, 2004. On January 21, 2005, Kinsey signed a reprimand form from Vanderwist. This form was designated as a written warning to Kinsey for violating Vanderwist's drug and alcohol policy. The portions of the policy that are quoted on the written warning prohibit employees from working under the influence of drugs or alcohol, or possessing drugs or alcohol on company property. The reprimand form does not indicate the factual predicate giving rise to the reprimand. Baumgartner stated that this warning was for actions by Kinsey that occurred on January 20, 2005. However, Kinsey was laid off by that time and was collecting unemployment benefits. Thus, a finder of fact could conclude the reprimand was *Page 14 
actually for the events of December 22, 2004. By his own admission, Kinsey possessed alcohol on Vanderwist's property on December 22, 2004. However, the fact that Vanderwist included the portion of the company's drug and alcohol policy that prohibits employees from working while under the influence is significant. This is indicative that Kinsey may have been working on December 22, 2004. That is, if Kinsey was only being reprimanded for possessing alcohol on company property, why was the language regarding working under the influence of alcohol included in the written warning?
 {¶ 43} Vanderwist argues that Kinsey was driving his personal vehicle at the time of the accident. This fact weighs in favor of a finding that Kinsey was not in the course and scope of his employment. However, on a daily basis, many people use their personal vehicles in the course and scope of their employment. The fact that Kinsey was using his personal vehicle, standing alone, does not preclude a finding that he was in the course and scope of his employment.
 {¶ 44} Vanderwist cites the Fifth Appellate District's decision inRhome v. USCCS, Ltd. Partenship, 5th Dist. No. 2006CA00185,2007-Ohio-2618 in support of its position. In Rhome, the court held that an employee was not in the course and scope of her employment at the time of an accident. Id. at ¶ 50. However, Rhome is distinguishable from the case sub judice on several points. First, the accident inRhome occurred 70 miles beyond the employee's normal route. Id. at ¶ 48. In this matter, Kinsey's accident occurred only a few miles from the Vanderwist garage and was directly on the route from the Vanderwist garage to Kinsey's home, where he stated he was headed to change clothes to assist Vanderwist with snow removal. Also, the Fifth District noted that driving intoxicated is a criminal act and is not within the scope of the *Page 15 
employee's employment. Id. We do not believe, as a matter of law, that a criminal act is per se outside of the scope of one's employment. If we were to adopt such a position, every traffic accident where the employee is at fault (failure to yield, speeding, red light violation) would be outside the scope of employment, since it would be a "criminal" act.
 {¶ 45} It is important to note that there is evidence in the record that Vanderwist provided all of the alcohol that caused Kinsey's impairment and, then, asked him to work despite his intoxicated condition. This is the main fact that distinguishes this case from most cases (including State Farm Mut. Auto. Ins. Co. v. King, supra) that address liability stemming from the office Christmas party or office golf outing. In this case, there is evidence that after the employer knows the employee has had enough alcohol to render the employee under the influence, the employer asks the employee to leave to start a mission for the benefit of the employer. The factual implications of this scenario cannot be resolved by summary judgment.
 {¶ 46} For purposes of summary judgment, the evidence must be construed "most strongly" in favor of the nonmoving party. Civ. R. 56(C). In this matter, there was evidence presented, which showed that (1) Kinsey "clocked in" on the morning of December 22, 2004, (2) Kinsey received compensation for working on December 22, 2004, (3) Kinsey was directly asked by his immediate supervisor to help with snow removal, (4) Kinsey told his boss that he would, in fact, help with the snow removal, (5) immediately following the accident, Kinsey told the investigating officer that he was on his way home to change clothes to assist with snow removal, (6) the accident occurred during the business day at a time when other Vanderwist employees were working, and *Page 16 
(7) Kinsey may have been reprimanded for "attempting to work while impaired by * * * alcohol." This evidence, when taken together and viewed most strongly in Whelan's favor, creates a genuine issue of material fact as to whether Kinsey was acting in the course and scope of his employment at the time of the accident. As such, the trial court erred in entering summary judgment on this claim.
 {¶ 47} Whelan's third cause of action is a claim of negligent hiring, supervision, and retention.
 {¶ 48} "The elements of a claim for negligent hiring, supervision, and retention are (1) the existence of an employment relationship, (2) the employee's incompetence, (3) the employer's knowledge of the employee's incompetence, (4) the employee's act or omission causing the plaintiff's injuries, and (5) a causal link between the employer's negligence in hiring, supervising, and retaining and the plaintiff's injuries."Lehrner v. Safeco Ins./Am. States Ins. Co., 171 Ohio App.3d 570,2007-Ohio-795, at ¶ 42, citing Harmon v. GZK, Inc. (Feb. 8, 2002), 2d Dist. No. 18672, 2002 Ohio App. LEXIS 480, at *41-42. See, also,Steppe v. Kmart Stores (1999), 136 Ohio App.3d 454, 465. (Citations omitted.)
 {¶ 49} In addition to these elements, the plaintiff must initially demonstrate that the employee was acting in the course and scope of his employment at the time of the act. State Farm Mut. Auto. Ins. Co. v.King, 12th Dist. Nos. CA2005-04-045 CA2005-04-049, 2006-Ohio-336, at ¶ 42, quoting Saleh v. Marc Glassman, Inc., 8th Dist. No. 86010,2005-Ohio-6127, at ¶ 28. (Secondary citations omitted.) In our analysis of Whelan's respondeat superior argument, we concluded that there is a genuine issue of material fact as to whether Kinsey was acting in the course and scope of his *Page 17 
employment at the time of the accident. Thus, we will address whether there is a genuine issue of material fact as to the other elements of Whelan's claim for negligent hiring, retention, and supervision.
 {¶ 50} Regarding the first element, the evidence suggests there was an employment relationship between Vanderwist and Kinsey on December 22, 2004. Heis stated that Kinsey was employed as an hourly employee on December 22, 2004.
 {¶ 51} Pertaining to the second factor, there was evidence supporting the conclusion that Kinsey was incompetent. Kinsey admitted consuming four to six beers on the morning of December 22, 2004. Then, while operating his vehicle, he traveled left-of-center, striking an oncoming vehicle.
 {¶ 52} As to the third element, there was evidence presented that Heis was aware of Kinsey's incompetence. We note that knowledge may be actual or constructive. Steppe v. Kmart Stores, 136 Ohio App.3d at 465. (Citations omitted.) Heis was present while several employees, including Kinsey, consumed beer. Further, the evidence demonstrated that Heis was present during the entire time Kinsey was consuming beer on December 22, 2004. There was no evidence presented that Kinsey consumed any beer before or after the Vanderwist sponsored events.
 {¶ 53} In regard to the fourth element, there was evidence submitted that shows Kinsey's act of operating a vehicle under the influence of alcohol and traveling left-of-center caused Edward Whelan's injuries. Edward Whelan died as a result of the accident.
 {¶ 54} Next, we will address whether there was evidence presented regarding a causal link between the actions of Vanderwist in its hiring, supervision, and retention of *Page 18 
Kinsey and Whelan's injuries. There was evidence that Vanderwist was aware that Kinsey had a prior conviction for driving under the influence of alcohol. Kinsey stated that his license was suspended at the time he was hired. Vanderwist provided a driver for Kinsey during that time. In addition, Kinsey stated that Heis helped him get his license reinstated. On the day in question, both Kinsey and Heis stated that Heis, on behalf of Vanderwist, purchased at least two pitchers of beer at the bowling alley. There is a dispute as to who purchased the beer that was consumed at the Vanderwist garage. Kinsey stated that Heis purchased two 12-packs of beer from a store called the Hitching Post on the way back from the bowling alley. Heis stated that Kinsey and Kelly brought the beer with them. Based on these facts, when taken together and viewed in a light most favorable to Whelan, it could be concluded that Vanderwist was negligent in its hiring, supervision, and retention of Kinsey, in that: (1) it was aware that Kinsey had a prior conviction for driving under the influence; (2) it provided beer to Kinsey and approved of his consumption of such beer during the work-related Christmas party sponsored by Vanderwist; and (3) it requested Kinsey assist with snow removal, knowing that Kinsey needed to travel home to accomplish this task.
 {¶ 55} There are genuine issues of material fact pertaining to Whelan's claim of negligent hiring, supervision, and retention. Therefore, the trial court erred in entering summary judgment on this claim.
 {¶ 56} Whelan's assignment of error has merit to the extent indicated.
 {¶ 57} The judgment of the trial court is affirmed regarding the trial court's entry of summary judgment pertaining to "business host" liability. The judgment of the trial court is reversed as it pertains to Whelan's claims for negligence under the doctrine of *Page 19 
respondent superior and negligent hiring, supervision, and retention. This matter is remanded to the trial court for further proceedings consistent with this opinion.
MARY JANE TRAPP, J., concurs, COLLEEN MARY O'TOOLE, J., concurs in judgment only. *Page 1